## THE RENO.

## THE MADELINE MESECK.

O'DONNELL v. BARNES–AMES CO., Inc., et al.

BARNES–AMES CO., Inc., v. O'DONNELL et al.

District Court, S. D. New York.

Oct. 30, 1931.

Rehearing Denied Nov. 17, 1931.

William F. Purdy, of New York City, for James T. O'Donnell.

Single & Single, of New York City (Thomas H. Middleton, of New York City, of counsel), for George Taylor and his executors.

Otto & Lyon, of New York City (Henry E. Otto, of New York City, of counsel), for Barnes-Ames Co., Inc.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for Meseck Towing Line, Inc., claimant.

WOOLSEY, District Judge.

My decision is as follows: In the first case, O'Donnell, as owner of the barge Reno, shall recover his damages primarily against the tug Madeline Meseck, and the subcharterer Barnes-Ames Company, Inc., shall be secondarily liable for those damages, and the executors of the charterer Taylor shall be liable in the event the damages cannot be liquidated by those primarily and secondarily liable therefor; that O'Donnell shall have his full costs, recoverable in the order of liability above mentioned, and that there shall be the usual interlocutory decree with a reference to assess the damages.

In the second case, I dismiss the libel against the barge Reno, and I also dismiss the libel against Taylor's executors, with costs to them as against the Barnes-Ames Company. I hold that the Madeline Meseck is liable, and that the Barnes-Ames Company may have an interlocutory decree against the said tug with the usual order of reference to assess damages, and that any costs which may be taxed against the Barnes-Ames Company herein by the other parties may be taxed by it as against the tug Madeline Meseck.

I. On June 8, 1928, the Barnes-Ames Company, having some grain in the state elevator at the foot of Columbia street, Brooklyn, telephoned to Taylor, who was then doing business as the Taylor Towing & Transportation Company, is now deceased, and whose executors have been substituted in his stead in this proceeding, that they had 20,000 bushels of wheat to be moved from the state elevator to the steamer Pipestone County at Pier 1, Hoboken, the pier of the Cosmopolitan Shipping Company.

Without going into the details of the several telephone conversations between Taylor and the libelant O'Donnell, and between Taylor and the Barnes-Ames Company, I think that the only appropriate inference to make from the evidence and the only conclusion to be drawn is that what really happened here was that, when the Barnes-Ames Company advised Taylor of its need, Taylor chartered the barge Reno from the libelant on the familiar and informal harbor charter of demise, and then subchartered her in the same way to the Barnes-Ames Company.

I reach this conclusion from the fact that it seems to me common ground, so far as Taylor and Barnes-Ames are concerned, that they had been doing business together for about fifteen years, and that Taylor had done about ninety-five per cent. of the Barnes-Ames work in connection with the movement of cargoes in the harbor; that the bill in the present case was typical of the bills rendered for such service. It was headed "For the charter and towing of the following boat"; then the boat is named, "Boat Reno, June 9–11, 1928, inc., three days at $12 per day"; and then the bill continues "Towing State Elevator to Pier 1, Hoboken," with a charge of $38 for the towing service.

Owing to the injury hereinafter referred to as suffered by the Reno, hire for an additional period of several days was subsequently added in a supplementary bill.

It was further shown, from what I believe was called the cargo book of Taylor, that Taylor paid O'Donnell, the libelant, for the hire of this barge before Taylor was paid in full by the Barnes-Ames Company.

Now this method of dealing meant that the only person whom O'Donnell knew, and to whom O'Donnell was giving credit, was Taylor; and that Taylor only knew the Barnes-Ames Company in this situation, and was giving credit to that company.

Accordingly, the theory of privity between O'Donnell and Barnes-Ames is destroyed, and the only remaining question is as to the nature of the relation between Taylor and Barnes-Ames.

As to that, I have already intimated in the first part of this opinion, which embodies my decision, that I think the fair inference to draw from the long-established system of charges shown between Taylor and Barnes-Ames and the recognition by Barnes-Ames, over a long period of years, of bills, all which were stated by the witnesses to have been with the same heading as the bill in this case, "For the charter and towing of the following boat," is that Barnes-Ames was a subcharterer of the barge Reno from Taylor. I so hold.

II. To continue with the story of this case.

■ On June 9th, during the morning, the cargo of wheat was loaded on the Reno and she was taken in charge by the tug Dr. George J. Moser, owned by Taylor, and landed at the northerly side of the slip, not far from the bulkhead, at Pier 1, Hoboken, inward from the bow of the Pipestone County which was lying bow in with her stern near the outside end of that pier.

The length of the Pipestone County is 390 feet, and the position in which she lay meant that her bow was about 415 or 420 feet from the pier end.

It seems to be common ground between the parties that the position in which the barge Reno was left was with her bow in, about 25 feet from the bulkhead. She herself is about 110 feet long, and, consequently, including the distance between her and the bulkhead there was about 135 or 140 feet between her stern and the bulkhead.

Thus the distance between her stern and the bow of the Pipestone County must, by a simple process of subtraction, have amounted to about 350 feet.

The Reno lay outside another barge, whose name does not appear. She was left safely moored there by the tug Dr. George J. Moser, and it seems to me that so far as the contract of Taylor with Barnes-Ames is concerned, it was properly and entirely performed when the Moser thus left the Reno at Pier 1. Thereafter, her bailment by Barnes-Ames to Taylor for the purpose of towage by Taylor having ended, her status from the point of view, which we have to consider here, was that of a vessel demised, and, therefore, bailed to Barnes-Ames, on which Barnes-Ames had its own cargo, and for whose movements, after Taylor had completed his work in connection with her, Barnes-Ames was responsible in the same fashion as any other demise charterer.

■ III. The history of the barge Reno seems to me to be unusually satisfactory.

I am told of a thorough overhaul in January, 1928. I am told of repeated inspection, all which were satisfactory, and more than that, I am told of a series of successful voyages carrying dry cargoes during the period of a month or so prior to the accident out of which this litigation arose.

It seems to me that there can hardly be any challenge of her seaworthiness when she entered upon the performance of her demise charter to Taylor and her demise subcharter to Barnes-Ames, and that therefore her owner performed his duty regarding her seaworthiness which does not involve a continuing warranty but merely requires seaworthiness when the charter began. Her seaworthiness made it perfectly proper for Barnes-Ames to load its cargo on board her.

■ IV. After this disgression as to the history of the barge before the charters began, I turn back to the occasion when she lay on the southerly side of Pier 1, Hoboken, in the position above described.

The evidence is that she lay without any damage of any kind, or any contact with any other vessel, and without any leak developing over Saturday, the 9th of June, and Sunday, the 10th of June, and that on Monday, the 11th of June, shortly before 8 o'clock, the tug Madeline Meseck, which has been brought into both these cases by petition, came to shift her from the place where she lay in the slip in order

to put her alongside a floating grain elevator called the New York which was lying on the port side of the steamship Pipestone County and occupying a distance along her side of about 200 feet.

The Pipestone County herself had a beam of 54 feet, the elevator New York, just referred to, had a beam of some 30 feet, if I remember correctly. Across on the other side of the slip and somewhat further in than the Pipestone County, there lay another steamer of the Hog Island type, similar to the Pipestone County in all dimensions. I do not know her name. The reason I do not know it is that pier 2, to which she was moored, was leased to a steamship company entirely foreign to the present controversy. This vessel, it is claimed by the master of the Reno, had a barge of some kind on her outer side which projected in toward the center of the slip. We are safe in assuming that the beam of the unknown steamer was 54 feet, and it is not going very far afield to assume that the barge was probably in the neighborhood of 25 to 30 feet in beam. The position of the vessels mentioned meant that there was a limiting of the free water area of the slip by the encroachment on one side of the Pipestone County and her elevator, and on the other side by this unknown steamer and the barge alongside her; so that the water free for maneuvering in the slip, which was about 262 feet wide, was so decreased by the space occupied by these two sets of vessels, that it was little more than 125 feet wide at the utmost.

V. Now the story of what happened in connection with the moving of the Reno alongside the elevator has been the subject of most of the really conflicting testimony in this case, and, in dealing with it, I feel that the evidence given yesterday by the so-called harbor master of Pier 1, representing the Cosmopolitan Line, the lessee or user of that pier, in saying that the master of the barge was not on board her during this maneuver in the slip, was rendered entirely valueless owing to a statement which he made a comparatively short time after the accident.

I challenged his statement at the time and had a short investigation, in connection with the trial of the case, as to whether he was consciously perjuring himself. I came to the conclusion, however, that I could not feel convinced beyond a reasonable doubt that he had been guilty of willful perjury, and so of a criminal contempt of court; but I held that his evidence was thoroughly discredited.

Thus we have to turn for the Meseck's case to the balancing of evidence between that of a man, the master of the Reno, who testified positively to the happening of a certain event, and the testimony of men who are engaged in handling a great many similar barges, whose testimony gave me the impression that they were testifying from their customary experience in such handling rather than from an individualized memory of this particular case.

There is, of course, something in the argument of the Madeline Meseck's counsel that the leak which developed and the consequent necessity of salving the Reno ought to be considered to have impressed the memory of the occasion on the minds of those on the tug as much as it had on the mind of the master of the Reno.

I have to say in this connection that questions of credibility are often really questions of the kind of impression that flows from the witness to the judge, and it is impossible oftentimes to say just why the court believes one man and does not believe another. The captain of the barge Reno, though illiterate, seemed to me very intelligent, and I think he was an honest witness.

I do not say that the Meseck's witnesses were consciously perjuring themselves, but I do feel that their evidence is not evidence on which I can rely as well as I can on the evidence of the captain of the Reno.

Therefore I accept the story of the captain of the Reno, which summarized is as follows:

When the tug fastened a short line of 8 or 10 feet on the stern of the Reno and pulled her out, stern first, toward her objective alongside the elevator New York, in some way the Reno got on a sheer which allowed her to strike the corner of the barge lying alongside the steamer on the southerly side of the slip, and caused her then to swing in the other direction, as a result of which she came in contact with the corner of the grain elevator.

This contact, I find, was a sharp blow at the least; it is described as quite a heavy blow by the master of the Reno. Its real strength can only be estimated from what I find to be its result.

That result was that after the Reno had been lying alongside the elevator for two or three hours a leak developed. I think

the leak was discovered about 10 or 10:30 a. m., when it was found she was making water quite rapidly, and it became necessary to take her away from alongside the elevator New York.

The Reno was then taken further down the river to Pier 6, where tugs kept her afloat by their suctions, and later that day, June 11th, she was taken to Bushey's Dry Dock, and, by prearrangement, drydocked at once after she got there.

It was then found that wheat and water were bleeding through a hole or wound in the lower part of her starboard side slightly abaft amidships; that this side showed evidence of having been somewhat scraped; and that whatever had struck her had struck her with sufficient force to make a series of small indentations which continued up her side from her bilge log, and to have broken or split the strake above her bilge log so that, apparently, the edge bolts which extend between this strake and the bilge log had been bent in to some extent, and the bilge log itself had been split by the action of these bolts.

When drydocked, the Reno had become so full of water that the grain in her had begun to swell, a phenomenon which is apparently well known in the grain trade, and which was stated in the testimony to cause very considerable pressure on the sides of vessels.

VI. The Reno was temporarily repaired, her cargo was taken out of her, and subsequently she came back to Bushey's and was examined, and on June 21st was surveyed there, on notice to the other parties, by her owner.

There was some dispute as to whether there were some holes in her grain lining or ceiling at that time, and one of the surveyors, a Mr. Loeser, claimed that these would have involved leaks of the grain into the bilges, and that then the normal bilge water would have caused the grain to swell and so damage the side of the bilge log.

The other experts who were called in rebuttal to answer this evidence point out, and I think correctly, that such a situation would have resulted in making small piles of grain under each hole, which, when they got slightly damp, would practically seal the holes so that the holes could not have gone on leaking grain indefinitely; and that so far as the pressure from the swelling of the grain that could have got into the bilges was concerned, that would naturally and obviously have affected the weakest member of the boxlike structure surrounding it, and so have burst the ceiling first, and second, the keelsons, and last of all the heaviest member; namely, the bilge log or its next heaviest member, the strake above the bilge log.

I think the evidence of these witnesses is perfectly satisfactory, and therefore I hold that the examination of the barge after the accident both immediately, on June 11th, and on the survey, on June 21st, confirms my view that the damage was a traumatic damage from outside contact as described, and that it did not involve any unseaworthiness of the hull of the Reno.

VII. With the facts thus disposed of and the fault thus fixed on the tug, we have only to consider further the relative liabilities as between, what I may perhaps appropriately call, the contractually related parties to these causes.

On my finding, we have the Reno bailed by her owner O'Donnell under a demise charter to Taylor, and by Taylor, in turn, under a similar charter to the Barnes-Ames Company.

When a barge, which has been delivered under a harbor demise charter to the charterer, is returned at the end of the charter in a damaged condition, there arises, under the familiar law of bailments, a presumption that such damage was due to the charterer's negligence, and the charterer, in order to overcome this presumption and escape liability, must show that the damage was not due to his own negligence (The Raymond M. White (D. C.) 290 F. 454, 458, affirmed (C. C. A.) 296 F. 1023; Cummings v. Penn. R. R. Co., 45 F.(2d) 152, 153 (C. C. A. 2), or to the negligence of any one whom he has employed to move or otherwise handle the barge of which he is bailee. White v. Upper Hudson Stone Co., 248 F. 893, 895 (C. C. A. 2).

Judge Hough, with the definite clarity so characteristic of him, said in White v. Upper Hudson Stone Co. (C. C. A.) 248 F. at page 895: "Since the relation between Bleakley, the scow owner, and the Upper Hudson Company, as charterer, was exactly that so recently restated by this court in Hastorf v. F. R. Long, etc., Co., 239 F. 852, 152 C. C. A. 638, the charterer was prima facie responsible for any failure to return the boat in good order reasonable wear excepted. The obligation was that of a bailee, and liability was not discharged by showing that the vessel had been intrusted to the care of another, and injured either

by that other's negligence or while in such other's charge. Gannon v. Consolidated Ice Co., 91 F. 539, 33 C. C. A. 662."

If after the evidence has been given by the demise charterer in explanation of a damage, the court finds that the charterer has not exculpated himself, the presumption against him remains in force, and the barge owner must get a decree.

The principles involved are admirably discussed, and many cases cited, in Tomkins Cove Stone Co. v. Bleakley, etc., Co., 40 F.(2d) 249–252 (C. C. A. 3); and see, also, Cummings v. Pennsylvania R. R. Co., 45 F.(2d) 152, 153 (C. C. A. 2), which cites the Tomkins Cove Case with approval.

■ So here, in the suit by the owner of the Reno, the Barnes-Ames Company has failed to exculpate itself as bailee of the Reno to its bailor Taylor, and Taylor, in turn, has failed to exculpate himself to O'Donnell, and the liability, placed first on the Madeline Meseck, must lie secondarily on the bailee nearest to the tug in relationship, and, in the third place only, on Taylor.

This marshaling of the order of liability depends, of course, on the procedural appropriateness of the form of a decree in a case where the parties are all before the Court, and not on the privity between the parties.

I will sign an order making this opinion the findings of fact and conclusions of law in this matter. Such an order must be submitted before or at the same time as the appropriate interlocutory decrees are submitted in these cases. Two days' notice of settlement is required.

### On Petition for Rehearing.

This petition for rehearing is denied.

I. This is in effect a request for a new trial, and not merely for a reargument on the record already made at the trial.

■ Whilst the fact that this petition is not verified by the petitioner, which is a local towing company, would properly be a technical reason for denying it, I shall pass that over, and deny it for other reasons.

Although, as a judge of a busy court, I should have received a motion for a mere reargument with some inhospitality, I feel still more inhospitable towards applications for a rehearing such as that now under consideration.

■ II. For the application here is based, by implication at least, on a failure of the petitioner properly to prepare its case for trial.

This is sought to be excused by a contention that the allegations of fault against the tug Madeline Meseck and the Meseck Towing Company in the interpleading petition were not specific, and that the actual claim of fault only developed on the trial, too late to enable its counsel to offer the evidence now sought to be put in on a rehearing.

The answer to an application so based is that the counsel for the Meseck Towing Company should have sought by appropriate interlocutory proceedings at motion term so to have clarified and fixed the issues as to enable them to go to trial on an intelligible basis. There are ample remedies in admiralty by which to secure such interlocutory relief for a third party impleaded, as the petitioner was in this case.

III. I regard it as an imposition on a busy court to ask it, for such reasons as are here given, to try over again a case which has already been fully heard in a trial lasting several days.

As I believe that the result reached after the trial was wholly justified by the evidence given thereat, the fact that one of the parties, owing to antecedent procedural inertia, may not have been able to take full advantage of its day in court, does not appeal to me.

That is a question rather to be dealt with between counsel and client, than between counsel and an overburdened court.